UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------X
DEBORAH INGANAMORTE,

                                    Plaintiff,           **MEMORANDUM OF DECISION
                                                         AND ORDER**
                                                         03-CV-5973 (DRH) (WBW)

            - against -

CABLEVISION SYSTEMS CORPORATION,

                                    Defendant.
------------------------------------------------------------X
**A P P E A R A N C E S :**

**LEEDS MORELLI & BROWN, P.C.**
Attorneys for Plaintiff
One Old Country Road, Suite 347
Carle Place, New York 11514
By: Rick Ostrove, Esq.

**MORGAN LEWIS & BOCKIUS LLP**
Attorneys for Defendant
101 Park Avenue
New York, New York 10178-0060
By: Amber Kagan, Esq.
    Carl G. Guida, Esq.

**HURLEY, District Judge:**

            Plaintiff Deborah Inganamorte ("Plaintiff") filed the present Title VII and New

York State Human Rights Law ("NYSHRL") action against her former employer, CSC

Holdings, Inc. ("Cablevision"), incorrectly identified in the Complaint as Cablevision Systems

Corporation, claiming that she was discriminated against based on her gender and retaliated

against for filing a complaint with Cablevision's Employee Relations Department.  Cablevision

has moved for summary judgment pursuant to Federal Rule of Civil Procedure 56.  For the

reasons that follow, Cablevision's motion is granted and this case is dismissed in its entirety.

*BACKGROUND*

The material facts, drawn from the Complaint and the parties' Local 56.1 Statements, are undisputed unless otherwise noted.

Prior to being hired by Cablevision, Plaintiff worked as a Senior Tax Manager with KPMG, an accounting firm, where she spent several years servicing KPMG's Cablevision account. During that time, Plaintiff developed a business relationship with Renzo Mori ("Mori"), the then head of Cablevision's Tax Department (the "Tax Department" or "Department"). On January 2, 2001, Mori hired Plaintiff to work for Cablevision as a Director of Tax.

*The Restructuring of the Tax Department*

On January 4, 2001, Cablevision retained KPMG to conduct a review of the Tax Department. KPMG discovered significant problems with the organization, leadership, and performance of the Tax Department and issued a report dated August 17, 2001, entitled "Tax Organization 'Best Practices,'" in which KPMG indicated that a "radical change" was required in the Tax Department's organization and leadership. KPMG also issued a more comprehensive draft report entitled "Tax Department Review – Findings & Analyses." In its reports, KPMG specifically cited Mori for a lack of leadership and noted poor management at the Director level and an overall lack of teamwork and collegiality within the Department. KPMG recommended that Cablevision make significant changes to the Department's management structure, including: (1) moving Mori from a leadership position to a more strategic role in the tax planning area; (2) terminating the employment of Steve Erickson, one of the Tax Directors; (3) creating a new Senior Vice President level position to head the Department; and (4) hiring a new Vice President

of Tax Operations.

As a direct result of KPMG's recommendations, Cablevision removed Mori as the head of the Department, placing him in a new Vice President of Tax Planning position, terminated the employment of Steve Erickson, and retained Plaintiff and Patricia Owens, the two other Tax Directors.

### *Cablevision Hires Philip D'Ambrosio as the New Senior Vice President of the Department*

In January 2002, Cablevision hired Philip D'Ambrosio ("D'Ambrosio"), a partner at the accounting firm of Ernst & Young LLP, as the new Senior Vice President of Tax. Plaintiff did not apply for, and was not qualified for, this position. D'Ambrosio began working at Cablevision on February 25, 2002.

D'Ambrosio's directive was essentially to improve the workings and morale of the Department. Specifically, he was charged with changing the focus of the Department from a reactive organization to a proactive one and improving communication between employees. To accomplish this, D'Ambrosio spoke with the following two Cablevision employees to obtain their insights into the Department: (1) Steve Martucci ("Martucci"), the partner from KPMG who conducted the review of Cablevision and who was now a Cablevision employee; and (2) James Hanley ("Hanley"), a Cablevision consultant who had previously been the partner at KPMG who was responsible for Cablevision's account. Cablevision claims that both men conveyed very negative views of Plaintiff; Plaintiff denies these allegations. In any event, according to Cablevision, D'Ambrosio decided to reserve judgment on Plaintiff until he had a chance to work with her and form his own opinion.

***D'Ambrosio's Consideration of Plaintiff for the Vice President of Tax Operations Position***

One of D'Ambrosio's initial priorities was to hire a Vice President of Tax Operations ("VPTO"), as recommended by KPMG. On February 8, 2002, before D'Ambrosio formally began working at Cablevision, he visited the company's offices, during which time he met with Plaintiff and other employees in the Department. During this visit, Plaintiff informed D'Ambrosio that she was interested in the VPTO position. On February 25, 2002, D'Ambrosio began working at Cablevision. Within a day or two thereafter, Plaintiff again asked D'Ambrosio about the VPTO position and he told Plaintiff to contact Carolyn Dursi, Cablevision's Vice President of Executive Recruiting, to schedule an interview. According to Cablevision, an interview with Plaintiff was originally scheduled for March 1, 2002, but was postponed to a different date.

On March 4, 2002, Plaintiff expressed concerns to D'Ambrosio that he had not yet scheduled her for the interview process. The next day, Plaintiff and D'Ambrosio finally met about the VPTO position. According to Cablevision, the purpose of this meeting was to interview Plaintiff for the position. According to Plaintiff, this meeting was not an interview as D'Ambrosio had already chosen his "guy" for the VPTO position; nonetheless, Plaintiff decided to meet with D'Ambrosio in hopes of persuading him to give her a chance.

According to Cablevision, D'Ambrosio viewed Plaintiff as being critical of the entire Department and ultimately concluded that Plaintiff was not appropriate for the position, especially given the fact that one of the problems observed by KPMG which D'Ambrosio was asked to correct was the lack of teamwork and collegiality within the Department. As a result, D'Ambrosio decided that it was not necessary for Plaintiff to continue with the interview

process, particularly as the other individuals on the hiring team already knew her. In addition, based on their respective experiences with Plaintiff, both Mori and Hanley also believed that Plaintiff lacked the requisite leadership skills to perform the managerial component of the VPTO position. Plaintiff disputes these claims, noting that during the period of time she reported to Mori, Mori gave Plaintiff an "exceeds expectation" rating on her annual performance evaluation. She further claims that Hanley told her that she was qualified for the VPTO position and had a reasonable shot at obtaining it.

***D'Ambrosio's Consideration of Other Candidates for the VPTO Position***

D'Ambrosio received resumes from sixteen candidates interested in the VPTO position, including Plaintiff. After reviewing these resumes, D'Ambrosio only considered Plaintiff and six other candidates for the position. The nine resumes that were not considered were all from a recruiting agency. The only other woman who applied for the job was Kathryn Meinsen, who had previously worked with D'Ambrosio at Ernst & Young. According to Cablevision, D'Ambrosio asked Kathryn Meinsen to apply for the position based on his experience with her.

According to Cablevision, Kathryn Meinsen was interviewed by six individuals on the hiring team and was a strong contender for the position. In addition, of the five men that were considered, three were not interviewed by the entire hiring team and two were interviewed after D'Ambrosio's meeting with Plaintiff. In response, Plaintiff contends that the interview schedule proffered by Cablevision does not reflect which interviews actually took place.

By letter dated March 8, 2002 and signed by D'Ambrosio, Cablevision offered the VPTO position to Noel Darvassy ("Darvassy"), whom D'Ambrosio decided was the best candidate and

with whom D'Ambrosio had worked with at Ernst & Young.  Hanley also believed that

Darvassy had better experience than Plaintiff and supported the decision to hire Darvassy

without any reservations.  According to Cablevision, had Darvassy rejected the position,

D'Ambrosio would have offered it to Kathryn Meinsen, whom D'Ambrosio considered his

"runner-up" for the VPTO position.  Plaintiff disputes this claim, noting that Kathryn Meinsen

did not interview with nearly as many people as Darvassy did.

Finally, in connection with the restructuring of the Department following

KPMG's review, D'Ambrosio promoted Donna Northrup from a manager to a director position.

***Problems With Plaintiff's Performance After Darvassy's Employment Begins***

Darvassy began working at Cablevision on March 25, 2002.  According to

Cablevision, during his first week at work, Darvassy met with various Department employees to

solicit their input and to ascertain the status of various projects that were underway.  Laurie

Lohrer, a Manager in the Department, Patricia Owens, a Director in the Department, Hanley, and

D'Ambrosio all expressed concerns to Darvassy about Plaintiff.  Specifically, they informed

Darvassy that Plaintiff was generally uncooperative, had difficulty relating to and working with

co-workers, and was not a team player.  Ms. Lohrer and Ms. Owens went so far as to state that

the main problem they faced in the Department was dealing with Plaintiff.  After speaking to

D'Ambrosio about these concerns, and given that Darvassy and D'Ambrosio were hired, in part,

to improve morale and collegiality within the Department, Darvassy and D'Ambrosio decided to

speak with Cablevision's Employee Relations Department about how best to proceed.  In early

April 2002, Darvassy and D'Ambrosio met with Robert Doodian ("Doodian"), Vice President,

Employee Relations and Staffing, who advised them that the appropriate way to proceed was to

place Plaintiff on a Performance Improvement Plan ("PIP"). Doodian and Darvassy have both submitted affidavits indicating that throughout the month of April and the beginning of May, Darvassy wrote and distributed several drafts of a PIP for Plaintiff. The purpose of the PIP was to point out the areas of Plaintiff's performance that Darvassy felt needed improvement and to afford Plaintiff an opportunity to make the necessary changes. Darvassy and Doodian presented Plaintiff with the final PIP on May 14, 2002.

Plaintiff contends that prior to D'Ambrosio's and Darvassy's arrival, she received a superior performance evaluation and a large bonus. She further claims that neither Trish Owens nor Laurie Lohrer filed any complaints against her until after Darvassy began working in the Department. In that regard, she asserts that both women complained about Darvassy's abusive conduct, thus demonstrating that Darvassy mistreats women. Finally, she states that she was a dedicated professional and offers examples which allegedly demonstrate her communicative skills.

### Plaintiff's Complaints to Employee Relations

On May 2, 2002, prior to being presented with the PIP, Plaintiff delivered a written complaint to Alan Gershowitz ("Gershowitz"), Cablevision's former Senior Vice President of Employee Relations. In her letter, Plaintiff claimed, inter alia, that she was not given a fair opportunity to interview for the VPTO position and expressed concern about the retention of her employment, as well as the employment of her staff.

Plaintiff's complaint was referred to Diana Sabato, Director of Employee Relations, for investigation. Ms. Sabato spoke to Plaintiff about her letter on May 3, 2002. After speaking with Hanley and Carolyn Dursi, Ms. Sabato concluded that Plaintiff had been

fairly considered for the VPTO position and informed Plaintiff of that conclusion.

Plaintiff claims that the PIP, which was presented to her on May 14, 2002, was given to her in retaliation for filing a complaint to Employee Relations.

**Plaintiff's Letter Claiming Title VII Violations**

On June 20, 2002, Plaintiff's attorney sent a letter to Gershowitz, claiming that Cablevision acted in a discriminatory manner towards her, particularly because she was not given a fair opportunity to interview for the VPTO position. The letter further asserts that Plaintiff had "valid claims" under Title VII and the NYSHRL based on Cablevision's conduct.

*Plaintiff's Termination*

After being presented with the PIP, Plaintiff repeatedly denied that she had done anything wrong or that any change was necessary. According to Cablevision, Plaintiff continued to exhibit the same types of conduct which were outlined in the PIP. On June 26, 2002, Darvassy sent a draft summary of the PIP results to Doodian, concluding, inter alia, that Plaintiff had not displayed any improvement in any of the areas cited in the PIP. On August 19, 2002, Darvassy terminated Plaintiff's employment. After her termination, D'Ambrosio and Darvassy interviewed several candidates for her position, including Laurie Lohrer and Robert Chichester, two Managers within the Department. Cablevision decided to promote Ms. Lohrer to Plaintiff's former position and Mr. Chichester resigned from the Company shortly thereafter.

*Plaintiff's EEOC Charge*

Plaintiff filed a charge of discrimination with the Equal Opportunity Employment Commission ("EEOC") on November 1, 2002. After investigating Plaintiff's claims, the EEOC issued a final determination dated September 2, 2003, concluding that "[t]he evidence fails to

indicate that a violation of law occurred."  (Affidavit of Amber Kagan, dated Mar. 3, 2005

("Kagan Aff."), Ex. Y.)  Plaintiff was also given a Right to Sue Letter.

***The Instant Action***

Plaintiff initiated the instant action on November 25, 2003.  Her Complaint

asserts four causes of action, viz. gender discrimination and retaliation under Title VII and

gender discrimination and retaliation under the New York State Human Rights Law (the

"NYSHRL").  Cablevision has moved for summary judgment.  For the reasons stated below,

Cablevision's motion is granted and this case is dismissed in its entirety.

## DISCUSSION

**I.      *Applicable Law and Legal Standards***

**A.      *Summary Judgment***

Summary judgment pursuant to Federal Rule of Civil Procedure 56 is only

appropriate where admissible evidence in the form of affidavits, deposition transcripts, or other

documentation demonstrates the absence of a genuine issue of material fact, and one party's

entitlement to judgment as a matter of law.  *See Viola v. Philips Med. Sys. of N. Am.*, 42 F.3d

712, 716 (2d Cir. 1994).  The relevant governing law in each case determines which facts are

material; "only disputes over facts that might affect the outcome of the suit under the governing

law will properly preclude the entry of summary judgment."  *Anderson v. Liberty Lobby, Inc.*,

477 U.S. 242, 248 (1986).  No genuinely triable factual issue exists when the moving party

demonstrates, on the basis of the pleadings and submitted evidence, and after drawing all

inferences and resolving all ambiguities in favor of the non-movant, that no rational jury could

find in the non-movant's favor.  *Chertkova v. Conn. Gen'l Life Ins. Co.*, 92 F.3d 81, 86 (2d Cir.

1996) (citing Fed. R. Civ. P. 56(c)).

To defeat a summary judgment motion properly supported by affidavits, depositions, or other documentation, the non-movant must offer similar materials setting forth specific facts that show that there *is* a genuine issue of material fact to be tried. *Rule v. Brine, Inc.*, 85 F.3d 1002, 1011 (2d Cir. 1996). The non-movant must present more than a "scintilla of evidence," *Delaware & Hudson Ry. Co. v. Consolidated Rail Corp.*, 902 F.2d 174, 178 (2d Cir. 1990) (quoting *Anderson*, 477 U.S. at 252), or "some metaphysical doubt as to the material facts," *Aslanidis v. U.S. Lines, Inc.*, 7 F.3d 1067, 1072 (2d Cir. 1993) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)), and cannot rely on the allegations in his or her pleadings, conclusory statements, or on "mere assertions that affidavits supporting the motion are not credible." *Gottlieb v. County of Orange*, 84 F.3d 511, 518 (2d Cir. 1996) (internal citations omitted).

The district court considering a summary judgment motion must also be "mindful of the underlying standards and burdens of proof," *Pickett v. RTS Helicopter*, 128 F.3d 925, 928 (5th Cir. 1997) (citing *Anderson*, 477 U.S. at 252), because the evidentiary burdens that the respective parties will bear at trial guide district courts in their determination of summary judgment motions. *Brady v. Town of Colchester*, 863 F.2d 205, 211 (2d Cir. 1988). Where the non-moving party will bear the ultimate burden of proof on an issue at trial, the moving party's burden under Rule 56 will be satisfied if he can point to an absence of evidence to support an essential element of the non-movant's claim. *Id.* at 210-11. Where a movant without the underlying burden of proof offers evidence that the non-movant has failed to establish her claim, the burden shifts to the non-movant to offer "persuasive evidence that [her] claim is not

'implausible.' " *Brady*, 863 F.2d at 211 (citing *Matsushita*, 475 U.S. at 587).

Summary judgment is generally inappropriate where questions of the defendant's state of mind are at issue, *Gelb v. Board of Elections of the City of New York*, 224 F.3d 149, 157 (2d. Cir. 2000), and should thus be granted with caution in employment discrimination cases. *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1224 (2d Cir. 1994); *Carlton v. Mystic Transp., Inc.*, 202 F.3d 129, 134 (2d Cir. 2000). Nonetheless, "summary judgment remains available to reject discrimination claims in cases lacking genuine issues of material fact." *Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 40 (2d Cir. 1994). "The summary judgment rule would be rendered sterile . . . if the mere incantation of intent or state of mind would operate as a talisman to defeat an otherwise valid motion." *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir. 1985). "[T]he salutary purposes of summary judgment — avoiding protracted, expensive and harassing trials — apply no less to discrimination cases than to commercial or other areas of litigation." *Id.* "When no rational jury could find in favor of the nonmoving party because the evidence to support its case is so slight, there is no genuine issue of material fact and a grant of summary judgment is proper." *Gallo*, 22 F.3d at 1224.

### B.     *The McDonnell-Douglas Burden-Shifting Methodology*

In *McDonnell-Douglas Corporation v. Green*, 411 U.S. 792, 802-804 (1973), the Supreme Court first enunciated the now-familiar "burden-shifting" formula used in analyzing Title VII employment discrimination claims based on indirect or circumstantial evidence. This standard was further refined in *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 252-253 (1981) and *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506-511 (1993).

Under *McDonnell-Douglas* and its innumerable progeny, (1) a plaintiff must first

establish a prima facie case of discrimination; (2) the burden then shifts to the employer to articulate a legitimate, nondiscriminatory reason for its actions; if the employer does so, the *McDonnell-Douglas* framework and its presumptions and burdens disappears, leaving the sole remaining issue of "discrimination vel non," and thus (3) the burden shifts back to the plaintiff to prove that the employer's stated reason is merely pretextual and that discrimination was an actual reason for the adverse employment action. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000). Although intermediate evidentiary burdens shift back and forth under this framework, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Id.*

The burden of establishing a prima facie case of employment discrimination has been described as "modest," *Viola v. Philips Med. Sys. of N. Am.*, 42 F.3d 712, 716 (2d Cir. 1994), or even "minimal." *Roge v. NYP Holdings, Inc.*, 257 F.3d 164, 168 (2d Cir. 2001). It is a burden of production, not persuasion, and involves no credibility assessments. *Reeves*, 530 U.S. at 143.

Likewise, the employer's burden of showing a legitimate non-discriminatory reason for its actions is not a particularly steep hurdle. It is not a court's role to second-guess an employer's personnel decisions, even if foolish, so long as they are non-discriminatory. *See Seils v. Rochester City Sch. Dist.*, 192 F. Supp.2d 100, 111 (W.D.N.Y. 2002) (citing, *inter alia*, *Meiri*, 759 F.2d at 995 (2d Cir. 1985)), *aff'd*, 99 Fed. Appx. 350 (2d Cir. 2004). Federal courts do not have a "roving commission to review business judgments," *Mont. v. First Fed. Sav. & Loan Ass'n of Rochester*, 869 F.2d 100, 106 (2d Cir. 1989) (quoting *Graefenhain v. Pabst Brewing Co.*, 827 F.2d 13, 21 n.8 (7th Cir. 1987)), and may not "sit as super personnel

departments, assessing the merits — or even the rationality — of employers' non-discriminatory business decisions." *Mesnick v. General Elec. Co.*, 950 F.2d 816, 825 (1st Cir. 1991). Thus, "[e]vidence that an employer made a poor business judgment generally is insufficient to establish a question of fact as to the credibility of the employer's reasons." *Dister v. Continental Group, Inc.*, 859 F.2d 1108, 1116 (2d Cir. 1988).

In order to demonstrate that the employer's stated non-discriminatory reasons for the allegedly discriminatory action are pretextual, "[a] plaintiff is not required to show that the employer's proffered reasons were false or played no role in the employment decision, but only that they were not the only reasons and that the prohibited factor was at least one of the motivating factors." *Cronin v. Aetna Life Ins. Co.*, 46 F.3d 196, 203 (2d Cir. 1995). A discrimination claimant may show pretext by demonstrating "such weaknesses, implausibilities, inconsistencies, incoherences, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons." *Bombero v. Warner-Lambert Co.*, 142 F. Supp.2d 196, 203 n.7 (D. Conn. 2000) (quoting *Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1179 (10th Cir. 1999), and citing *Olson v. Gen. Elec. Astrospace*, 101 F.3d 947, 951-52 (3d Cir. 1996)), *aff'd*, 9 Fed. Appx. 38 (2d Cir. 2001).

However, to rebut an employer's proffered non-discriminatory rationale for its actions and withstand summary judgment, a plaintiff must present more than allegations that are "conclusory and unsupported by evidence of any weight." *Smith v. Am. Exp. Co.*, 853 F.2d 151, 154-55 (2d Cir. 1988). "To allow a party to defeat a motion for summary judgment by offering purely conclusory allegations of discrimination, absent any concrete particulars, would

necessitate a trial in all Title VII cases." *Meiri*, 759 F.2d at 998.

**II.      *Plaintiff Fails to Raise a Genuine Issue of
           Material Fact as to her Promotion Claim***

Plaintiff claims that she was not promoted to the VPTO position because of her gender. To establish a prima facie case of discrimination under Title VII, a plaintiff must show that: (1) she belonged to a protected class, (2) was qualified for the position she held or sought, and (3) suffered an adverse employment action (4) under circumstances giving rise to an inference of discriminatory intent. *Terry v. Ashcroft*, 336 F.3d 128, 138 (2d Cir. 2003). Cablevision does not dispute that Plaintiff has established the first and third elements of her prima facie case, viz. that she was a member of a protected class and that she suffered an adverse employment action. Cablevision does contend, however, that Plaintiff cannot prove that she was qualified for the VPTO position and that her failure to receive this position occurred under circumstances giving rise to an inference of discrimination. The Court will discuss Cablevision's contentions in turn.

**A.      *Qualification for the VPTO Position***

The Court's task in assessing Plaintiff's qualifications at the prima facie stage is a limited one. The Second Circuit has "long emphasized that the qualification prong must not be interpreted in such a way as to shift into the plaintiff's *prima facie case* an obligation to anticipate and disprove the employer's proffer of a legitimate, non-discriminatory basis for its decision." *Gregory v. Daly*, 243 F.3d 687, 696 (2d Cir. 2001) Thus, to show qualification, a plaintiff need not demonstrate perfect or even average performance. "Rather, she need only make the 'minimal showing' that she possesses the basic skills necessary for the performance of the job." *Id.* (citations and internal quotation marks omitted). This minimal showing is

consistent with the purpose of the qualification prong which "'is simply to help eliminate[] the most common nondiscriminatory reasons for the plaintiff's rejection.'" *Id.* (quoting *Texas Dept of Comty. Affairs v. Burdine*, 450 U.S. 248, 254 (1981)). "It cannot be more than that." *Id.*

Cablevision does not dispute that Plaintiff had the *technical* qualifications for the VPTO position. Instead, Cablevision argues that Plaintiff cannot show that she had the necessary leadership and management skills required for the position. In this regard, Cablevision's job posting for the VPTO position indicates that "[e]xperience in leading (and motivating) a team of professionals" is required. (Pl.'s Aff., dated Sept. 30, 2005 ("Pl.'s Aff."), Ex. T.) Cablevision proffers the deposition testimony of D'Ambrosio, Mori, and Hanley, who all testified that, in their opinions, Plaintiff lacked these skills. (*See* Def.'s Rule 56.1 Stmt. ¶ 26-27.)

Plaintiff, in turn, relies on Hanley's deposition testimony that he initially thought Plaintiff had a "reasonable shot at the job" and Mori's deposition testimony that Plaintiff was "qualified" for the position.[1] (Pl.'s Rule 56.1 Counter Stmt. ¶ 27.) Plaintiff also contends that the evidence demonstrates that her employment history, credentials, and experience rendered her more than "qualified" pursuant to the criteria listed in Cablevision's job posting.

After juxtaposing Plaintiff's credentials with Cablevision's job posting for the VPTO position, the Court finds that Plaintiff has made a "minimal showing" that she was qualified for the VPTO position. In fact, in some regards, Plaintiff's experience and qualifications exceeded the minimal requirements listed in the posting. For example, the VPTO

---

[1] Although Mori initially testified that Plaintiff "had the qualifications" for the VPTO position, (Mori Dep., dated Nov. 8, 2004, at 38), he later stated that he was referring solely to the technical qualifications and not the managerial component, (*id.* at 59).

position required an individual who had "10+" years of professional experience with a preference for experience in the "media/cable/entertainment" industries.  (Pl.'s Aff., Ex. T.)  The posting also noted that "Big Five firm experience [was] a plus [at] a 2nd year senior manager level or above."  (*Id.*)  Plaintiff had fourteen years of experience in the tax field at the time the VPTO position became available, more than half of which took place in the "Big Five" accounting firm of KPMG, where she held the position of senior tax manager for over five years.  In addition, Plaintiff had over eight years of experience specifically relating to the cable industry.

There being no real dispute that Plaintiff was "technically" qualified for the position, the Court finds that Plaintiff has satisfied this element of her prima facie case.  In the Court's opinion, the dispute over Plaintiff's management and leadership skills is not sufficient to overcome this "inference of minimal qualification," which is all that plaintiff is required to show at this stage in the analysis.  *See Gregory,* 243 F.3d at 969 (plaintiff not required to disprove defendant's proffer).

**B.**  ***Whether Plaintiff's Failure to Receive the VPTO Position Arose Under Circumstances Giving Rise to an Inference of Discrimination***

It is undisputed that the VPTO position went to Darvassy, a man.  The Second Circuit has held that a plaintiff may satisfy the fourth prong of a prima facie case of discrimination by demonstrating either "the ultimate filling of the position with an individual who is not a member of the protected class" or, alternatively, "the discharge or adverse employment action occurred under circumstances giving rise to an inference of discrimination on the basis of plaintiff's membership in that class."  *Farias v. Instructional Sys., Inc.*, 259 F.3d 91, 98 (2d Cir. 2001) (citing, inter alia, *Quaratino v. Tiffany & Co.*, 71 F.3d 58, 64 (2d Cir. 1995));

*see also Schnabel v. Abramson*, 232 F.3d 83, 87 (2d Cir. 2000) ("[T]he fact that [plaintiff] was replaced by a 31-year-old is sufficient to give rise to the inference that [plaintiff] was the victim of discrimination."). Accordingly, the Court finds that Plaintiff has established a prima facie case of discrimination.[2]

> **C.** **Cablevision's Burden of Showing a Legitimate Non-Discriminatory Reason for its Actions**

As noted previously, an employer's burden of showing a legitimate non-discriminatory reason for its actions is not particularly onerous. Here, both D'Ambrosio and Hanley agreed that Darvassy was better qualified for the position as he possessed both the necessary technical qualifications *and* the management/leadership skills. With regard to his technical qualifications, Darvassy, like Plaintiff, worked at one of the "Big Five" accounting firms, to wit, Ernst & Young, for over nine years before joining Cablevision. (Pl.'s Aff., Ex. I.) During his last 2½ years at Ernst & Young, he was a Senior Tax Manager. (*Id.*) Also like Plaintiff, Darvassy had extensive experience in the cable, media, and entertainment industries. (*Id.*)

With respect to Darvassy's managerial qualifications, D'Ambrosio worked extensively with Darvassy while they were both at Ernst & Young. Based on this firsthand experience, D'Ambrosio determined that Darvassy had excellent supervisory and leadership skills. During his last 2½ years at Ernst & Young, Darvassy coordinated the work of over 50 employees and D'Ambrosio was impressed with his ability to manage large numbers of

---

[2] Cablevision asserts that the fact that the VPTO position went to a man is insufficient in and of itself to satisfy the fourth prong of Plaintiff's prima facie case. All of Cablevision's citations, however, are to lower court decisions. Given that the Second Circuit has repeatedly held that such evidence suffices to meet this element, the Court rejects Cablevision's contention.

individuals.  On the other hand, D'Ambrosio had serious reservations about Plaintiff's

managerial skills.  Thus, D'Ambrosio ultimately concluded that Darvassy was overall the best

candidate for the position.  This is a legitimate and non-discriminatory reason for offering the job

to Darvassy and not Plaintiff.  *See, e.g.*, *Holt v. KMI-Continental, Inc.*, 95 F.3d 123, 129 (2d Cir.

1996) (finding that candidate's superior qualifications can be legitimate, non-discriminatory

reason).

### D.       Whether Cablevision's Proffered Reasons Are Pretextual

Once an employer has articulated a legitimate, non-discriminatory reason for its

actions, the plaintiff then has the burden of showing that the stated reason was pretextual, and

that more likely than not discrimination motivated the adverse employment action.  In an attempt

to establish that Cablevision's proffered reason is a pretext for discrimination, Plaintiff alleges

that: (1) she was more qualified than Darvassy for the VPTO position; (2) she was not treated

fairly in the interview process; and (3) other female employees were mistreated by Darvassy.

For the reasons stated below, all of these claims fail to demonstrate pretext.

### 1.       Plaintiff's Qualifications v. Darvassy's Qualifications

Plaintiff submits that pretext is established by the fact that Darvassy, who

allegedly was less qualified than Plaintiff, was hired for the VPTO position.  Although the

Second Circuit has "recognized that an employer's disregard or misjudgment of a plaintiff's job

qualifications may undermine the credibility of an employer's stated justification for an

employment decision," the Circuit has also noted that "[a]t the same time, the court must respect

the employer's unfettered discretion to choose among qualified candidates."  *Byrnie v. Town of

Cromwell, Bd. of Educ.*, 243 F.3d 93, 103 (2d Cir. 2001) (citations and internal quotation marks

omitted).  In cases such as this, where the plaintiff claims that unlawful discrimination is demonstrated by the employer's choice of a candidate with lesser qualifications, the plaintiff carries an especially "weighty burden." *Id.*  "[T]he plaintiff's credentials would have to be so superior to the credentials of the person selected for the job that no reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over the plaintiff for the job in question."  *Id.* (citation and internal quotation marks omitted); *see also id.* ("'Title VII liability cannot rest solely upon a judge's determination that an employer misjudged the relative qualifications of admittedly qualified candidates.'") (quoting *Fischbach v. D.C. Dep't of Corr.*, 86 F.3d 1180, 1183 (D.C. Cir. 1996).

Here, Plaintiff's credentials on their own do not meet this burden. While no one questions that Plaintiff had the technical qualifications for the VPTO position, it is also beyond dispute that Darvassy was also well-qualified.  Simply put, after comparing Plaintiff's "paper credentials" with those of Darvassy's, it cannot be said that Plaintiff's are so superior that Cablevision acted unreasonably in electing to offer Darvassy the position.  *See id.* at 103.

Nevertheless, just because the discrepancy between Darvassy's and Plaintiff's qualifications does not on its own create a material issue of fact, that does not mean the discrepancy is stripped of all probative value.  Rather, the credibility of the employer "must finally be evaluated from the perspective of the entire record." *Id.* at 104.  Here, Cablevision only used the applicants' paper credentials in part in making its determination.  Darvassy was ultimately chosen as the most qualified candidate because D'Ambrosio viewed him as having the best leadership and managerial skills, while Plaintiff was viewed as lacking the interpersonal skills necessary for the position.

Although an employer is entitled to base its hiring decisions on subjective criteria, so long as its reasons are non-discriminatory, an employer cannot rely on "wholly subjective and unarticulated standards." *Id.* at 104 (citation and internal quotation marks omitted). Rather, an employer must offer "clear and specific" reasons for its subjective choice. *Id.* at 105 (citation and internal quotation marks omitted). "Where an employer's explanation, offered in clear and specific terms, 'is reasonably attributable to an honest even though partially subjective evaluation of . . . qualifications, no inference of discrimination can be drawn.'" *Id.* at 105 (quoting *Lieberman v. Gant*, 630 F.2d 60, 67 (2d Cir. 1980)).

As evidence of pretext, Plaintiff claims that Darvassy did not possess the strong management and leadership skills claimed by Cablevision. Plaintiff further disputes D'Ambrosio's claim that he was given negative information about Plaintiff's skills in this regard. The record does not bear out these contentions.

With regard to Darvassy's managerial skills, D'Ambrosio submitted an affidavit wherein he states that:

> As part of the search for a qualified VPTO, I had contacted [Darvassy], an experienced tax professional with whom I had worked extensively while we were both at [Ernst & Young]. In particular, Darvassy had been an important part of successfully servicing the AOLTW account. It was my opinion that Darvassy's experience with the AOLTW account, including his technical expertise, his familiarity with the industry and his ability to coordinate and manage large numbers of employees, set him apart from the other candidates for the VPTO position. Based on these qualifications, my knowledge of and trust in Darvassy's work, and the expressed need to inject positive change into the Department's leadership structure, I decided that Darvassy was the best candidate for the VPTO position.

(D'Ambrosio Aff., dated Mar. 2, 2005, ¶ 9.)

Plaintiff contends that D'Ambrosio's statement conflicts with Darvassy's deposition testimony, where he indicated that during his last 2½ years at Ernst & Young, while a Senior Tax Manager, he had "a lot of people" reporting "a huge amount" of information to him and was responsible for coordinating their work but that these employees did not report directly to him. (Darvassy Dep., dated Dec. 2, 2004, at 52-53.) Thus, Plaintiff contends, Darvassy did not manage any employees in his position as Senior Tax Manager. Plaintiff neglects to mention, however, that a few pages later, Darvassy states that although no one reported directly to him during his last 2½ year at Ernst & Young, he did have employees reporting directly to him prior to that last position. (*Id.* at 53-54.) Viewing his deposition testimony in toto, during his 9½ years at Ernst & Young, Darvassy both coordinated the work of a large number of employees (as a Senior Tax Manager) and directly managed employees (prior to that position). Thus, contrary to Plaintiff's contentions, Darvassy's deposition testimony is consistent with D'Ambrosio's claims.

With respect to whether D'Ambrosio was ever provided negative information about Plaintiff, especially regarding her "people-skills," the record amply demonstrates that Hanley, Mori, and Martucci all advised D'Ambrosio that they believed that Plaintiff lacked the requisite leadership and interpersonal skills to perform the managerial component of the VPTO position. (*See* Mori Dep., dated Nov. 8, 2004, at 59, 66-68; Hanley Dep. at 79-85, 105-117; Mori Aff., dated Oct. 18, 2005, ¶ 4; D'Ambrosio Aff., dated Mar. 2, 2005, ¶¶ 4-5; Kagan Aff., Ex. K.). Accordingly, the Court rejects Plaintiff's contention that there is an issue of fact regarding whether or not D'Ambrosio was given negative information about Plaintiff.

In sum, the Court finds that no inference of discrimination can be drawn

regarding Cablevision's decision to hire Darvassy and not Plaintiff vis a vis their respective qualifications.[3]

### 2. The Interview Process/Alleged Mistreatment of Women

Plaintiff claims that the way she was treated during the interview process for the VPTO position, and the way women were treated in the Department in general, raise an issue of fact as to the issue of pretext. Because these claims are interrelated, they will be discussed in tandem.

### a. The Interview Process

Plaintiff argues that although she was "exceptionally qualified for the [VPTO] position and had received positive employment evaluations, . . . she was not even interviewed for the position." (Pl.s' Mem. at 13.) In this regard, she further claims that "no females were given an opportunity to interview with top level management." (*See id.* at 14.)

As an initial matter, with regard to whether or not Plaintiff was interviewed, it is undisputed that D'Ambrosio and Plaintiff "met" on March 5, 2002. D'Ambrosio asserts that this meeting was an interview, after which he concluded that Plaintiff was not appropriate for the position. As a result, he did not believe it was necessary for Plaintiff to continue with the interview process, especially because the other individuals on the hiring team already knew her. (Def.'s Rule 56.1 Stmt. ¶ 26.) It is further undisputed that no other interviews with Plaintiff were conducted.

---

[3] Plaintiff's contention that Cablevision's claim that it wanted to hire a strong leader for the VPTO position is belied by its lateral placement of Mori to Vice President of Tax Planning, even though the KPMG audit indicated that Mori had leadership deficiencies, is not relevant as it is undisputed that Mori was never under consideration for the VPTO position.

Plaintiff contends that her meeting with D'Ambrosio was not a real interview because she had been told by Carolyn Dursi prior thereto that D'Ambrosio had already made up his mind as to who he was going to hire. Plaintiff also asserts in her counter Rule 56.1 Statement than she did not know the members of the hiring team, however, she fails to proffer any citation to the record to support this statement. (Pl.'s Rule 56.1 Counter Stmt. ¶ 26.)

With regard to how other women were treated during the interview process, it is undisputed that only two of the sixteen individuals who applied for the VPTO position were women, to wit, Plaintiff and Kathryn Meinsen. It is further undisputed that Kathryn Meinsen was interviewed, as were five of the male applicants. Thus, nine of the fourteen men who applied for the VPTO position were not even considered, four of whom Plaintiff conceded had better qualifications that she did. (*See* Pl.'s Dep. at 323, 326, 339, 350.) However, Plaintiff points out that nine of the male applicants were referred from a recruiting agency and that D'Ambrosio chose not to interview any of them based on that fact alone; thus, Plaintiff argues, gender played no role whatsoever in whether these nine applicants were considered. (*See* Pl.'s Rule 56.1 Counter Stmt. ¶ 32.) Because the record is unclear as to why these nine male applicants were not considered, (*see* D'Ambrosio's Dep. at 99), the Court will disregard these nine applicants for the purpose of this analysis. Doing so leaves seven applicants – five men and two women – all of whom were considered for the position. Of these five men, Plaintiff concedes that one, Paul Catoggio, was better qualified than her. (*See* Pl.'s Dep. at 323.)

Cablevision proffers its interview schedule for the VPTO position, which indicates that three of these five male applicants were not interviewed by the entire interview team and that two of them were interviewed after Plaintiff's March 5, 2006 meeting with

D'Ambrosio. (Kagan Aff. Ex. M.) It further shows that Kathryn Meinsen was interviewed by the entire interview team with the exception of Andrew Rosengard, Cablevision's former Executive Vice President of Finance and Controller, the final step in the hiring process. (*See* Def.'s Rule 56.1 Stmt. ¶¶ 31, 42.)

Citing Hanley's deposition testimony, Plaintiff argues that this interview schedule is not accurate. (*See* Pl.'s Rule 56.1 Counter Stmt. ¶¶ 31, 33.) Hanley testified that they "had major problems getting anybody assigned to the interviews to actually do them. They would give them to other people in the department, or in several cases I was just asked to talk to the person for two hours until the interview process was over." (Hanley's Dep. at 56.) He further stated that the schedule was most likely accurate in the sense that these interviews were *scheduled* to occur but that "a lot of the interviews did not happen or did not happen with the person that they were scheduled to meet with." (*Id.* at 61-62.) Instead, people scheduled to conduct interviews "would have someone else in their department at a lower level [conduct the interview]." (*Id.* at 57.)

Even assuming that Hanley's deposition testimony creates a question of fact as to which interviews actually occurred, this evidence is far too thin to permit a rational trier of fact to conclude that gender played a role in the interviewing process. At the very least, the interview schedule reveals that: (1) Darvassy was scheduled to interview with seven people; (2) Kathryn Meinsen was scheduled to interview with six people; (3) one of the male applicants was scheduled to interview with five people; (4) three of the male applicants were scheduled to interview with three people; and (5) Plaintiff was scheduled to meet with D'Ambrosio and Carolyn Dursi. (Kagan Aff. Ex. M.) Although the record is unclear as to whether or not these

interviews went ahead as scheduled, the Court finds that there is nothing in the schedule, or in the present record regarding the interview process, which suggests that gender was a factor in selecting the VPTO. Plaintiff attempts to cast the circumstances surrounding the interview process in a discriminatory light by arguing that "no females were given an opportunity to interview with top level management." (Pl.'s Mem. at 14.) This argument is misleading, however, when viewed in the context of the entire record. Only two women applied for the VPTO position and both were considered. One of the women, Kathryn Meinsen, had more interviews scheduled, and perhaps more conducted, than any of the other male applicants with the exception of Darvassy, who ultimately obtained the position. The fact that Plaintiff did not interview with other members of the hiring team may have been unfair but it does not give rise to an inference of discrimination.[4]

In addition, Plaintiff's claims that gender played a role in the hiring process are further diminished when considered in light of Cablevision's treatment of women in the Department. In connection with KPMG's review, Mori was demoted and a male director, Steve Erickson, was fired. In contrast, the two female directors, Plaintiff and Patricia Owens, remained in their positions. Moreover, after the reorganization, D'Ambrosio promoted Donna Northrup from a manager to a director position, and, significantly, later promoted Laurie Lohrer to replace Plaintiff after her employment was terminated. *See Montanile v. National Broadcast Co.*, 211 F. Supp. 2d 481, 487 (S.D.N.Y. 2002) ("That a plaintiff is replaced by another in the same protected class weighs heavily against the inference that she suffered discrimination.")

---

[4] In fact, D'Ambrosio testified that had Darvassy rejected the position, he would have offered it to Kathryn Meinsen, whom D'Ambrosio considered his runner-up for the VPTO position. (*See* Def.'s Rule 56.1 Stmt. ¶ 42.)

Accordingly, the Court finds that there is nothing in the way the interview process was conducted that might lead a reasonable trier of fact to conclude that Plaintiff was discriminated against because she was a woman.

### b. Alleged Mistreatment of Other Female Employees

Plaintiff contends that:

> The fact that plaintiff and the only two other females in the tax department all had complaints about the way they were treated after D'Ambrosio's arrival demonstrates a disparate treatment, as men did not lodge similar complaints. (Mori 43-45) Moreover, D'Ambrosio's disparate treatment [is demonstrated by] the fact that he would entertain dinner arrangements with his male counterparts, whereas no evidence suggests that the female colleagues in the tax department were treated in that manner. (D'Ambrosio 21-24)

(Pl.'s Mem. at 14.) In support of her first statement, Plaintiff relies on Mori's deposition testimony and a Human Resources Memorandum. (*See* Pl.s' Rule 56.1 Stmt. ¶ 46.) Mori testified that both Trish Owens and Laurie Lohrer made comments that Darvassy was a "task master" who "ha[d] to have things his way." (Mori Dep. at 44.) He further stated that Trish Owens told him that Darvassy was verbally abusive towards her in that he "called her into his office and was yelling at her for something." (*Id.* at 45.)

The Human Resources Memorandum is a memorandum to the file from Doodian about his June 28, 2002 meeting with Laurie Lohrer. It states as follows:

> Frank Livoti and Rob Doodian [met] with Laurie Lohrer of the Tax Department on June 28, 2002, regarding the current environment in the department. Laurie felt that in general there has been less teamwork since Phil D'Ambrosio and Noel Darvassy came on board. She feels that your opinion is not valued and that any old work is discounted as not being valuable.
>
> She feels that Noel is approachable; however, he can be

condescending at times. For example, he's made comments to her like, "Why don't you know that?" and "What do you mean you don't know that." She said that he's never yelled at her, nor has she ever heard him yelling at anyone.

(Pl.'s Aff. Ex. J.)

The Court is not persuaded that any of the above bears any relevance on the issue of gender discrimination. Simply put, there is no gender component to the alleged complaints/comments. Moreover, the "complaints" Plaintiff refers to were actually solicited by Cablevision's Employee Relations Department in connection with the investigation of Plaintiff's allegations. (*See* Second Doodian Aff, dated Oct. 18, 2005 ("Second Doodian Aff.").) Although Plaintiff cites to only one of these interviews, as Cablevision points out in its reply papers, seven interviews were conducted, five with women and two with men. Only one woman, Laurie Lohrer, raised an issue about Darvassy's and D'Ambrosio's conduct, which was not in any way gender-based. Significantly, one of the men, Jim Castaldo, also raised an issue, complaining that Darvassy "spoke[] to him in a demeaning way," "was really hard on him," and "ma[d]e him feel like an 'idiot.'" (*Id.* Ex. A.) Accordingly, Plaintiff's proffer fails to raise an issue of fact as to gender discrimination.

In sum, Plaintiff has failed to produce sufficient evidence to support a rational finding that the non-discriminatory reasons proffered by Cablevision for the challenged employment actions were pretextual or that gender discrimination played any role in Cablevision's decision regarding the VPTO position. Accordingly, Plaintiff's discrimination claims based on her failure to obtain this position are dismissed.[5]

_____

[5] To the extent Plaintiff contends D'Ambrosio "would entertain dinner arrangements with his male counterparts" and not the female ones, (Pl.'s Mem. at 14), Plaintiff fails to cite to

**III.** **Plaintiff Fails to Raise a Genuine Issue of Material Fact as to her Retaliation Claims**

Plaintiff alleges that Cablevision retaliated against her by: (1) issuing the PIP less than two weeks after she filed her complaint with Employee Relations;[6] and (2) terminating her employment after her attorney wrote to Cablevision claiming that Plaintiff had valid claims under Title VII. The Court will discuss Plaintiff's claims in turn.

**A.** **Plaintiff's Claim Regarding the PIP**

To establish a prima facie case of retaliation under Title VII, an employee must show: "'(1) she was engaged in an activity protected under Title VII; (2) the employer was aware of plaintiff's participation in the protected activity; (3) the employer took adverse action against plaintiff; and (4) a causal connection existed between the plaintiff's protected activity and the adverse action taken by the employer.'" *Mack v. Otis Elevator Co.*, 326 F.3d 116, 129 (2d Cir. 2003) (quoting *Gordon v. New York City Bd. of Educ.*, 232 F.3d 111, 116 (2d Cir. 2000)). Once the employee has established a prima facie case, the employer must proffer a legitimate, non-discriminatory reason for the adverse action. If it does so, then the burden shifts back to the employee to demonstrate pretext. *Slattery v. Swiss Reins. Am. Corp.*, 248 F.3d 87, 94-95 (2d Cir. 2001).

With regard to the first element of Plaintiff's prima facie case, in order for Plaintiff to have been involved in a protected activity, Plaintiff must have had "a good faith,

---

any part of the record which supports this contention. Instead, Plaintiff cites to pages 21-24 of D'Ambrosio's deposition, which is not part of the record before the Court. (*See id.*) In any event, the Court fails to see the significance of such a claim.

[6] The Court notes that although the PIP was not formally issued until after Plaintiff filed her complaint with Employee Relations, the undisputed documentary evidence reveals that actual drafts of the PIP were prepared well before Plaintiff's complaint was filed.

reasonable belief that the underlying employment practice was unlawful" under Title VII. *Galdieri-Ambrosini v. National Realty & Dev. Corp.*, 136 F.3d 276, 292 (2d Cir. 1998) (citations and internal quotation marks omitted). As to the second element, the employer's awareness, Cablevision must have "understood, or could reasonably have understood, that . . . [P]laintiff's opposition was directed at conduct prohibited by Title VII." *Id.*

Here, even assuming Plaintiff genuinely believed that she was the victim of gender discrimination at the time she filed her complaint with Employee Relations, Plaintiff cannot establish a prima facie case because there is no evidence in the record from which a reasonable trier of fact could conclude that Cablevision would have understood that Plaintiff was complaining of gender discrimination. Plaintiff's May 2, 2002 complaint speaks of her concerns over her job retention, as well as that of her staff, arising out of the reorganization of the Department and the alleged unfair treatment she has received as a result thereof. (*See* Kagan Aff., Ex. V.) Nowhere in this 4½ page document does Plaintiff state or imply that gender has anything to do with her objections. To the contrary, Plaintiff's complaint indicates that other employees, including men, were receiving similar unfair treatment and were also concerned about their job security. (*See id.*)

Plaintiff tries to avoid this conclusion by arguing that since her complaint was "written and specifically tailored to use the terms and phrases in defendant's anti-discrimination policy," "a jury could infer that [Cablevision] could have understood that plaintiff's complaint was a discrimination complaint." (Pl.'s Mem. at 17 (emphasis omitted).) The flaw with this argument is that although portions of Plaintiff's complaint may have mirrored some general language contained in Cablevision's Employee Handbook, Plaintiff notably failed to include the

express language in that handbook policy that refers to "discrimination" or "harassment." (*See* Pl.'s Aff. Ex. O.) In fact, Plaintiff's complaint does not even contain the words "gender," "harassment," or "discrimination" in it.

Furthermore, Plaintiff never claimed that she was the victim of discrimination during her interviews with Diana Sabato, Director of Employee Relations, who was investigating the "concerns" Plaintiff raised in her complaint.

In sum, "[Plaintiff's] complaints in no way intimated that she believed [Cablevision's] conduct to be influenced by her gender, and hence there was no evidence to support a finding that [Cablevision issued the PIP to] her in retaliation for opposing Title VII-prohibited discrimination." *Galdieri-Ambrosini*, 136 F.3d at 292.

### B.     *Plaintiff's Termination*

Plaintiff claims that she was terminated in retaliation for her in-house complaint to Employee Relations[7] and her attorney's letter to Cablevision. The following facts are undisputed in this regard.

Darvassy began preparing a PIP in April 2002. Plaintiff filed her complaint with Employee Relations on May 2, 2002. Darvassy and Doodian presented Plaintiff with the PIP on May 14, 2002. The PIP provides, in part, as follows:

> The following [PIP] has been prepared to assist you in meeting the standards of your position. You will be given up to 45 days to improve your performance in these areas to the expected levels outlined below.
>
> During this period, I will meet with you on a bi-weekly basis to

---

[7] The Court has already determined that Plaintiff's in-house complaint is insufficient to support a claim of retaliation, *see supra*.

assist you with the [PIP] outlined below.  I also will make myself
available to discuss any other matters that might arise in the
normal course of business.  The following areas are in need of
immediate improvement.

. . . .

This Plan is designed to help improve your performance in the
above stated areas within the next ninety days.  If any of the above
situations occur within the next ninety days, if you are unable to
improve and sustain improvement in the designated areas or if you
engage in any conduct that violates the Company's
[v]alues/policies, (during this period and thereafter), you will be
subject to further corrective action up to and including termination
of your employment.

(Kagan Aff., Ex. T.)  The PIP is signed by Darvassy.  (*See id.*)

On June 20, 2002, Plaintiff's attorney sent a letter to Gershowitz, Cablevision's

former Senior Vice President of Employee Relations, claiming that Plaintiff had "valid claims"

under Title VII and the NYSHRL.  On August 19, 2002, Darvassy terminated Plaintiff's

employment.

Cablevision does not dispute that the letter written by Plaintiff's attorney

constituted a protected activity or that her termination was an adverse action.  Thus, in order to

establish a prima facie case of retaliation, Plaintiff must show that Darvassy was aware of the

June 20th letter and that a causal connection existed between the letter and Plaintiff's termination.

*See Mack*, 326 F.3d at 129.

Darvassy, who made the recommendation to terminate Plaintiff's employment,

testified at his deposition that he did not learn of Plaintiff's complaints, including her lawyer's

letter, until after Plaintiff's employment was actually terminated.  Citing that testimony,

Cablevision argues that Plaintiff cannot establish that Darvassy had notice of Plaintiff's

complaints. Although there is no evidence in the record to contradict Darvassy' claim, given that Plaintiff was fired two months after her attorney sent the letter, the Court will assume for present purposes that a reasonable trier of fact could disbelieve Darvassy's testimony.

Cablevision next argues that "even if Darvassy had been aware of Plaintiff's complaint, the record shows that his decision to terminate her employment was not related in anyway to her complaints, but rather was based on her complete failure to comply with the terms of the PIP." (*Id.* at 18-19.) In this regard, Cablevision claims that "Darvassy's decision was merely a continuation of the course of activity he commenced prior to Plaintiff's alleged protected activity." (*Id.* at 19.)

In the Second Circuit, a plaintiff can indirectly establish a causal connection to support a discrimination or retaliation claim by "showing that the protected activity was closely followed in time by the adverse [employment] action." *Reed v. A.W. Lawrence & Co.*, 95 F.3d 1170, 1178 (2d Cir. 1996) (citation and quotation marks omitted) (stating that twelve days between alleged sexual harassment and discharge could suggest a causal relationship). Though there is no bright-line rule, an adverse employment action following within a couple months of the protected activity typically suffices to establish causal connection. *See Cioffi v. Averill Park Cent. School Dist. Bd. of Educ.*, 444 F.3d 158, 168 (2d Cir. 2006) ("[T]he lapse of only several months after the letter and several weeks after the press conference between the protected speech and adverse employment action is sufficient to support an allegation of a causal connection strong enough to survive summary judgment.") (collecting cases); *Gormon-Bakos v. Cornell Co-op Extension of Schenectady*, 252 F.3d 545, 555 (2d Cir. 2001) (passage of up to five months short enough for causal connection).

In the present case, Plaintiff was fired two months after her attorney sent his letter. Thus, at first blush, it would seem that Plaintiff has satisfied the causal nexus requirement. However, the Second Circuit has held that "[w]here timing is the only basis for a claim of retaliation, and gradual adverse job actions began well before the plaintiff had ever engaged in any protected activity, an inference of retaliation does not arise." *Slattery*, 248 F.3d at 95.

Here, as in *Slattery*, Plaintiff fails to establish a factual dispute that her termination was not part and parcel of the PIP process, but rather was based on retaliatory animus for her attorney's letter claiming discrimination. Apart from temporal proximity, Plaintiff does not base her retaliation claim on any other argument. In that regard, Plaintiff has failed to offer *any* evidence suggesting that her termination was in any way related to her attorney's letter. *See, e.g.*, *Davis v. Oyster-Bay East*, No. 03-CV-1372, 2006 WL 657038, at *14 (E.D.N.Y. Mar. 9, 2006) (finding that plaintiff had not established a prima facie case of retaliation where no evidence that adverse action taken as a result of protected activity, other than temporal proximity); *Walker v. The Access Agency*, No. 3:02CV199, 2004 WL 2216526, at *7 (N.D.N.Y. Aug. 31, 2004) (granting summary judgment on retaliation claim where plaintiff's claim was based on temporal proximity alone and record showed that termination was part of "an extensive period of financial difficulty"); *Hunter v. St. Francis Hosp.*, 281 F. Supp. 2d 534, 547 (E.D.N.Y. 2003) (granting employer's motion for summary judgment: "Based on the fact that Plaintiff's work evaluations and disciplinary record were consistent both before and after he filed his retaliation claim, this Court finds that Plaintiff has not established a causal relationship between the protected activity and his evaluations/disciplinary record.").

The Court recognizes that in *Slattery*, the "gradual adverse job actions began" a

full five months before plaintiff engaged in the protected activity, while in this case, Darvassy began drafting the PIP approximately two months before Plaintiff's attorney's letter.  Although the "period of progressive discipline" was not as extensive here as it was in *Slattery*, considering the evidence as a whole, and that Darvassy was hired to effectuate a "radical change" in the Department pursuant to KPMG's report, this distinction does not warrant a result different than the one reached in *Slattery*.  In this regard, the fact that Plaintiff may have received positive evaluations from Mori prior to the restructuring of the Department is not particularly relevant given the fact that KPMG's report specifically cited Mori as part of the problem with the Department.

Moreover, as in *Slattery*, Plaintiff's termination is consistent with the terms of the PIP which warned Plaintiff that if she did not improve, she could be fired.  Cablevision proffers Darvassy's affidavit wherein he sets forth examples of how Plaintiff continued to exhibit the same performance problems after receiving the PIP.   Cablevision also submits a June 26, 2002 memorandum from Darvassy to Doodian summarizing the results of the PIP.  (Kagan Aff., Ex. U.)  The memorandum indicates that Plaintiff "has not exhibited any noticeable change in the way she conducts herself," Plaintiff "has not displayed any improvement in the area of teamwork," Plaintiff "continues to disregard my requests," and Plaintiff has the "habit . . . of seeing herself as accountable to no one."  (*Id.*)

Plaintiff attempts to create an issue of fact by arguing that the "examples of deficiencies with her performance are highly contested by [P]laintiff."  (Pl.'s Mem. at 20.)  Plaintiff's subjective beliefs, uncorroborated by any evidence in the record, are insufficient to raise an inference of retaliation.  Moreover, although Plaintiff disputes her alleged poor

performance, given Plaintiff's position that the PIP was false and her repeated denial that she had done anything wrong or that any change was necessary, (*see* Def.'s Rule 56.1 Stmt. ¶ 59; Pl.'s Rule 56.1 Counter Stmt. ¶ 59), it is not surprising that Darvassy would find that Plaintiff had not improved or changed her performance. In sum, the Court finds that, on this record, no reasonable inference exists that Plaintiff's termination was done in response to her attorney's letter.

Moreover, even assuming arguendo that a prima facie case was established, other than disputing the quality of her performance, Plaintiff has failed to offer sufficient evidence to raise a genuine issue as to whether the legitimate non-retaliatory reasons given by Cablevision for Plaintiff's termination were a subterfuge for illegal retaliation. Therefore, the Court grants summary judgment in favor of Cablevision on this issue as well.

## IV.     *Plaintiff Fails to Raise a Genuine Issue of Material Fact as to her Hostile Work Environment Claim*

To establish a hostile work environment claim, a plaintiff must prove "[1] that the harassment was 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment,' and [2] that a specific basis exists for imputing the objectionable conduct to the employer." *Alfano v. Costello*, 294 F.3d 365, 373 (2d Cir. 2002) (quoting *Perry v. Ethan Allen, Inc.*, 115 F.3d 143, 149 (2d Cir. 1997)). "The plaintiff must show that the workplace was so severely permeated with discriminatory intimidation, ridicule, and insult that the terms and conditions of her employment were thereby altered." *Id.*

"This test has objective and subjective elements: the misconduct shown must be 'severe or pervasive enough to create an objectively hostile or abusive work environment,' and

the victim must also subjectively perceive that environment to be abusive." *Id.* at 374 (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)). In analyzing a plaintiff's case, "courts examine the case-specific circumstances in their totality and evaluate the severity, frequency, and degree of the abuse." *Id.* (citing *Harris*, 510 U.S. at 23). Relevant factors include "'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Id.* (quoting *Harris*, 510 U.S. at 23).

"Finally, it is 'axiomatic' that in order to establish a sex-based hostile work environment under Title VII, a plaintiff must demonstrate that the conduct occurred because of her sex." *Id.* (quoting *Brown v. Henderson*, 257 F.3d 246, 252 (2d Cir. 2001)); *see also Brennan v. Metropolitan Opera Ass'n*, 192 F.3d 310, 318 (2d Cir. 1999) ("A plaintiff must also demonstrate that she was subjected to the hostility because of her membership in a protected class. In other words, an environment which is equally harsh for both men and women or for both young and old does not constitute a hostile working environment under the civil rights statutes.").

Here, after setting forth a general recitation of the law in this area, Plaintiff devotes one sentence in her memorandum of law to this claim, arguing that she "was subject to conduct which affected her work environment and men were not subject to similar conduct." (Pl.'s Mem. at 16.) In support, she cites to paragraphs 20 and 21 of her affidavit, wherein she sets forth examples of how Darvassy and D'Ambrosio allegedly treated her in a "hostile, discriminatory, harassing and unprofessional manner thereby creating a hostile work environment." (Pl.'s Aff. ¶ 20.) Included among her examples are: (1) D'Ambrosio continually

interrupted her and condescendingly dismissed her professional opinions; (2) D'Ambrosio publicly criticized parts of her presentation; (3) D'Ambrosio refused to look at her during a meeting, looking at her male assistant instead; (4) Darvassy stared "at certain women in the office to such a degree that [P]laintiff and other females present felt uncomfortable"; (5) Darvassy attempted to make eye contact and winked at her; (6) Darvassy and D'Ambrosio excluded Plaintiff from meetings; and (7) Darvassy publicly scolded Plaintiff and shouted that "he did not trust" her. (*Id.*)

The Court finds that these incidents, viewed as true, cannot form the basis for a hostile work environment for two reasons. First, they do not rise to the level of conduct that is "'severe or pervasive enough to create an objectively hostile or abusive work environment.'" *Alfano*, 294 F.3d at 374 (quoting *Harris*, 510 U.S. at 21)). Drawing all inferences in Plaintiff's favor, although the conduct of which Plaintiff complains may have been offensive, no rational juror could find that "the workplace was so severely permeated with discriminatory intimidation, ridicule, and insult that the terms and conditions of [Plaintiff's] employment were thereby altered." *See id.* at 373. While D'Ambrosio's and Darvassy's conduct may have made Plaintiff uncomfortable, there is no evidence to suggest that either man intended to intimidate, ridicule, or demean Plaintiff on account of her gender. *See id.* at 21 ("Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment--an environment that a reasonable person would find hostile or abusive--is beyond Title VII's purview."). Accordingly, the Court finds that Plaintiff has failed to raise a genuine issue of material fact that Darvassy's or D'Ambrosio's conduct was "severe or pervasive enough to create an objectively hostile or abusive work environment." *See Harris*, 510 U.S. at 21.

Second, there is nothing in the record to indicate that the alleged conduct was made on the basis of gender.  *See Alfano*, 294 F.2d at 374; *see also Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998) ("Title VII does not prohibit all verbal or physical harassment in the workplace; it is directed only at 'discriminat[ion]. . . because of . . . sex.' . . . . 'The critical issue, Title VII's text indicates, is whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed.'") (quoting 42 U.S.C. § 2000e-2(a)(1) and *Harris*, 510 U.S. at 25).  In this regard, the only gender-based conduct Plaintiff cites is Darvassy's alleged propensity to stare.  The only evidence she proffers in this regard is her own affidavit.  Based on the present record, the Court finds that this conduct, even if it occurred, is insufficient to raise a genuine issue of fact as to this claim.

Moreover, as noted above, in connection with the investigation of Plaintiff's allegations, Cablevision's Employee Relations Department conducted an investigation, interviewing seven employees in the Department, five women and two men.  Only one woman, Laurie Lohrer, complained about Darvassy and D'Ambrosio and her complaint was not in any way gender-based.  Instead, she indicated that there had been less teamwork since D'Ambrosio and Darvassy came aboard and that Darvassy could be condescending at times.  (Second Doodian Aff. Ex. A.)  In addition, one of the men, Jim Castaldo, complained that Darvassy spoke to him in a demeaning way.  (*Id.*)  This evidence further supports a finding that although Darvassy and D'Ambrosio may have been difficult to work with, their conduct was not directed specifically to men or women.

In sum, the Court finds that the alleged conduct in this case falls far short of an

actionable claim. Accordingly, Plaintiff's claims of gender discrimination based on an alleged hostile work environment are dismissed.

**V.**     ***Plaintiff's New York State Human Rights Law Claims Are Dismissed***

As mentioned previously, Plaintiff also claims that Cablevision violated the NYSHRL. This claim too, must fail.

Discrimination and retaliation "claims under the NYSHRL are analyzed identically to claims under . . . Title VII," and "the outcome of an employment discrimination claim made pursuant to the NYSHRL is the same as it is under . . . Title VII." *Smith v. Xerox Corp.*, 196 F.3d 358, 363 n.1 (2d Cir. 1999). Thus, NYSHRL claims are generally considered "in tandem" with Title VII claims, *see Leopold v. Baccarat, Inc.*, 174 F.3d 261, 264 n.1 (2d Cir. 1999), and a district court need not explicitly evaluate a plaintiff's NYSHRL claims where it has thoroughly analyzed the plaintiff's Title VII claims. *Smith*, 196 F.3d at 363 n.1. In the present case, as Plaintiff has failed to state either a discrimination or retaliation claim under Title VII, she has ipso facto failed to state these claims under the NYSHRL as well.

*CONCLUSION*

For all of the above reasons, Cablevision's motion for summary judgment is GRANTED as to all of Plaintiff's claims, and this case is accordingly DISMISSED in its entirety. The Clerk of Court is directed to CLOSE this case.

**SO ORDERED.**

Dated: September 21, 2006
        Central Islip, New York                    /s_____
                                                    Denis R. Hurley,
                                                    United States District Judge